# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

JAMES W. NICHOLSON,

Plaintiff,

v.                                          9:13-CV-277
                                            (LEK/ATB)

SGT. ERIC C. MILLER,

Defendant.

JAMES W. NICHOLSON, Plaintiff, pro se
JAMES B. McGOWAN, AAG, for the Defendants

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this civil rights complaint, plaintiff alleges that defendant Miller retaliated against plaintiff for filing grievances, and on one occasion, beat him because of his grievance activity. (Complaint "Compl." at 4-5).[1]  Plaintiff also claims that defendant Miller issued plaintiff a false misbehavior in retaliation for his grievances.  Plaintiff lists three First Amendment causes of action. (Compl. at 6).  Plaintiff seeks substantial monetary relief. (Compl. at 7).

Presently before the court is defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 43).  Despite receiving three extensions of time to do

---

[1] Unless otherwise noted, the court will cite to the pages of the complaint as assigned by the court's electronic filing system ("CM/ECF"), but will not repeat the reference to CM/ECF.

so, plaintiff has not filed a response to the defendant's motion.[2] (*See* Dkt. Nos. 45, 47, 50). For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.

## DISCUSSION

### I. <u>Summary Judgment</u>

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273.

---

[2] In my most recent order, granting plaintiff another extension of time to respond, but denying appointment of counsel, I noted that plaintiff had been released and was attempting to find an attorney on his own. (Dkt. No. 52). It appears from plaintiff's change of address, filed on November 10, 2014, that plaintiff is back in custody and is now confined at the Rensselaer County Jail. (Dkt. No. 53).

In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

## II.    Facts

### A.    Complaint

Plaintiff alleges that while he was incarcerated in Bare Hill Correctional Facility ("Bare Hill"), he filed "over 20 grievances, asserting staff harassment, threats, and DOCCS staff sleeping on the job." (Compl. at 4). Plaintiff states that between June 2011 and July 2011, he was interviewed by defendant Miller regarding "several" of the grievances. Plaintiff claims that during the interview, defendant Miller became "verbally aggressive" and told plaintiff that if he filed one more grievance, defendant Miller would send plaintiff to a "MAX Prison!" *Id.* Plaintiff claims that he told defendant Miller that filing grievances was constitutionally protected, and Miller responded by beating plaintiff to the point that he had to be taken to the medical unit, where pictures were taken of plaintiff's injuries. (*Id.*)

Plaintiff states that, when he was released from the medical unit, he was taken to the Special Housing Unit ("SHU") and issued a misbehavior report for disobeying a direct order. (Compl. at 5). Plaintiff claims that, after he was issued the misbehavior report, defendant Miller came to his cell and told plaintiff that he would dismiss the

charges if plaintiff would stop filing grievances against the security staff. (*Id.*) Plaintiff told defendant Miller that "he was violating [plaintiff's] rights to have access to the court," and defendant Miller responded: "Fuck the Courts!" (*Id.*) Plaintiff claims that he wanted to get out of SHU, so he agreed that he would not file any more grievances. Plaintiff states that he was released from SHU, but then sent to a maximum security prison.

Plaintiff lists three causes of action, but which are actually two causes of action based on First Amendment retaliation:[3] (1) one claim based on assault "for engaging in protected conduct;" and (2) the second claim for issuing a false misbehavior report in retaliation for filing grievances and then dismissing the charges in exchange for plaintiff's promise to stop filing grievances. (Compl. at 6).

## B. Defense Materials

In support of his motion for summary judgment, defendant Miller has submitted his own declaration with exhibits attached; the declaration of Sergeant Berkman, with exhibits attached; and the declaration of Jeffery Hale, the Assistant Director of the Inmate Grievance Program ("IGP"), with exhibits. (Dkt. No. 43-2 - 43-6). Plaintiff was deposed on February 7, 2014, and defense counsel has filed his own affidavit with excerpts of plaintiff's deposition and another exhibit in support of the motion for summary judgment. (Dkt. No. 43-6, Def.'s Ex. 2). Rather than detail all the defendants' facts at the outset, I will discuss the evidence as I analyze the issues presented by

---

[3] The conduct listed in the first "Cause of Action" states, generally, that defendant Miller retaliated against plaintiff for filing grievances, while the other two causes of action specify the conduct that plaintiff alleges was retaliatory: assault and false misbehavior report.

4

defendants' motion.

## III.   Exhaustion of Administrative Remedies

### A.   Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675–76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (exhaustion requirement applies, *inter alia*, to excessive force claims)).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings.  *Id.* at 675.  The failure to exhaust is an affirmative defense that must be raised by the defendants.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).  As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements.  *See, e.g, Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state procedural rules, including meeting appropriate deadlines. *Jones v. Bock*, 549 U.S. at 218–19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion is a prerequisite to

5

bringing suit in federal court. 548 U.S. at 90–103. In *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516 (2002), the Second Circuit specifically held that completion of the administrative review process includes receiving the decision on the final appeal of a grievance ***prior to*** filing the federal action.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

At the same time that the Second Circuit decided *Giano*, it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused.[4] Based on these cases, the Second Circuit developed a

---

[4] *See Hemphill v. State of New York*, 380 F.3d 680 (2d Cir. 2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis*, 380 F.3d 663 (2d Cir. 2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman*, 380 F.3d 691 (2d Cir. 2004) (whether including

"three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom*, 446 F.3d 305, 311–12 (2d Cir. 2006) (citing *Hemphill*, 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

Although the Second Circuit has not explicitly held that *Hemphill* remains good law after *Woodford*, it has noted in more recent cases, that the exhaustion requirement may be excused, as have other district courts.[5] *See, e.g.*, *Macias v. Zenk*, 495 F.3d 37 (2d Cir. 2007) (using the three-part inquiry); *Davis v. State of New York*, 311 F. App'x 397, 399 (2d Cir. 2009) (recognizing that there may be exceptions to the exhaustion requirement); *Snyder v. Whittier*, 428 F. App'x 89, 91 (2d Cir. 2011) (using the three-part inquiry); *Carlson v. Parry*, No. 06-CV-6621, 2013 WL 5354517, at *9-10 (W.D.N.Y. Sept. 24, 2013) (recognizing that the exhaustion requirement may be excused); *Morrison v. Hartman*, 898 F. Supp. 2d 577, 581 (W.D.N.Y. 2012) (same).

claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride*, 380 F.3d 649 (2d Cir. 2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

[5] This court also notes that, based upon the concurring opinion in *Woodford*, it appears that the Second Circuit decisions have *not* been overruled in that respect. In his concurring opinion in *Woodford*, Justice Breyer specifically noted that two circuits, the *Second* Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford*] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford*, 548 U.S. at 104 (citing *Spruill v. Gillis*, 372 F.3d 218, 232 (3d Cir. 2004); *Giano v. Goord*, 380 F.3d 670, 677 (2d Cir. 2004)) (Breyer, J. concurring). Justice Breyer then stated that on remand, the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a *traditional exception that the statute implicitly incorporates*." *Id.* (emphasis added). This statement implies that there are still exceptions that a court may consider.

## B.    Application

Defendant argues that plaintiff has failed to exhaust his administrative remedies with respect to both of his claims.  In his declaration, Jeffery Hale states that in his capacity as the Assistant Director of the IGP, he is the custodian of the records maintained by the CORC. (Hale Decl. ¶¶ 1-2, Dkt. No. 43-3).  The CORC maintains files of grievance appeals in a computer database. (*Id.* ¶ 4).  This database contains records of all appeals received from the facility IGP offices which have been heard by the CORC since 1990, together with some historical data from appeals, decided as long ago as 1986. (*Id.*)

Assistant Director Hale states that the information regarding the grievance procedures, including the appeals process, is contained in the Department of Corrections and Community Supervision ("DOCCS") Directive No. 4040.[6] (*Id.*)  The Directives are available to inmates through the facility library. (*Id.* ¶¶ 5-6).  The procedural steps are quite clearly written. (*See* Hale Decl. Ex. 1, Directive No. 4040 at p.5) (quoting 7 N.Y.C.R.R. § 701.5(a)-(d)).  Nothing in Directive No. 4040 states that an inmate may exhaust his administrative remedies by writing directly to the Inspector General's ("IG") Office, rather than appealing to the CORC. (*Id.* ¶ 7 & Ex. 1) (*See* Directive No. 4040 (quoting 7 N.Y.C.R.R. § 701.5(d)(1)-(d)(4)).

At the request of defense counsel, Assistant Director Hale conducted a search of the database for records of any appeal to the CORC filed by plaintiff, relating to

---

[6] The Directive quotes the sections of the New York State Rules and Regulations that this court has cited above. Directive No. 4040 (quoting §§ 701.1-701.11).  Section 701.5 outlines the general procedures, and section 701.8 provides procedures for "allegations of employee harassment."

incidents that he states occurred in 2011. (*Id.* ¶ 8).  Assistant Director Hale found only one grievance appeal to the CORC which related to incidents in 2011 that plaintiff claims occurred at Bare Hill. (*Id.* ¶ 9).  The appeal was of Grievance BRL-11938-11, which was filed by plaintiff on January 10, 2011, and complains that Sergeant "Manor" threatened and retaliated against plaintiff for filing grievances by moving him to a different dormitory. (*Id.* ¶ 10 & Ex. 2). This grievance could not be related to the incidents of which plaintiff complains in this federal action because BRL-11938-11 was filed in January of 2011, while plaintiff alleges that this defendant's retaliation occurred between June and July of 2011. (Compl. at 4).  The CORC had no record of the appeal of any grievance alleging that plaintiff was assaulted by defendant Miller or any other staff at any time in 2011. (*Id.*)

Plaintiff also appears to have filed another grievance that was not appealed to the CORC. (McGowan Decl. Ex. 1).  The grievance was BRL-12122-11, and it is dated May 27, 2011. (*Id.*)  The grievance states that plaintiff was "moved" on May 25, 2011 in retaliation for filing grievances. (*Id.*)  Plaintiff claimed that the grievance to which he was referring involved writing to the IG about Officer Ashlaw sleeping and not "doing the count on the D2 Dorm." (*Id.* at 3).  Plaintiff states in the grievance that "in retaliation," he was moved from D2 to A1, which meant that he was placed into a "double bunk situation, that you fight so hard to get out of." (*Id.*)  Plaintiff claimed that he had been keeping track of the officers' conduct, and that he was sure that Officer Ashlaw knew about the letter to the IG. (*Id.* at 4).  Although this may be the grievance that plaintiff refers to in the complaint as precipitating Miller's alleged assault, there is

no indication that plaintiff ever filed a grievance about the alleged assault or about the false misbehavior report that defendant Miller allegedly filed against him. Thus, plaintiff has failed to exhaust his administrative remedies with respect to the claims made in this action.

The court has also considered the *Hemphill* three-part inquiry to determine if the exhaustion requirement may be excused. The remedies were clearly available to plaintiff because he states in his complaint that he used the grievance process a great deal.[7] During his deposition, plaintiff testified that he was well-aware of the grievance procedures. (Pl.'s Dep. at 14). The court does note that plaintiff was transferred to Clinton on June 6, 2011. Plaintiff testified that he complained about the alleged beating after he was transferred to Clinton, and after he had been released from "mental health."[8] (Pl.'s Dep. at 62). However, plaintiff testified that he did not have a copy of the grievance because "they" lost the whole bag of "legal" when he got to Clinton.[9] (*Id.*) He also stated that he never met with the IGRC, and that he never filed an appeal. (*Id.* at 62-63). Plaintiff stated that he did not file an appeal because he "wrote right to

---

[7] In fact, the complaint mentions twenty grievances. Although it does not appear that he filed twenty actual "grievances" as the term is used in the Directives, plaintiff was certainly aware of the proper procedure.

[8] Plaintiff does not, and would not be able to allege that the grievance procedure was "unavailable" simply because he was transferred.

[9] The allegation that a grievance was "lost or destroyed" does not excuse the exhaustion requirement. *Smith v. Kelly*, 985 F. Supp. 2d 275, 271 n.8 (N.D.N.Y. 2013) (citing inter alia *Rosado v. Fessetto*, No. 9:09 CV 0067, 2010 WL 3808813, at *7 (N.D.N.Y. Aug. 4, 2010) (Baxter, M.J.) ("Courts have consistently held . . . that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."), *adopted by* 2010 WL 3809991 (N.D.N.Y. Sept. 21, 2010) (Hurd, J.)).

the IG" instead. (*Id.* at 63). Plaintiff may be arguing that his attempt at writing directly to the IG excuses his failure to follow the regular grievance procedure.

Defense counsel questioned plaintiff about his knowledge of the grievance procedure, and plaintiff stated that he believed that in order to exhaust "[y]ou have to go all the way through, unless you resolve your grievances other ways, like telling the people that should do something about it, like through CROC [sic], or either through people that know to do something about it, like IG." (*Id.*) Writing to the IG does not fulfill the exhaustion requirement. *See McPherson v. Rogers*, No. 9:12-CV-766, 2014 WL 675830, at *7 (N.D.N.Y. Feb. 21, 2014).

In any event, plaintiff claimed that the IG "resolved" his issue on April 18, 2013. (*Id.*) However, plaintiff filed this federal complaint in March of 2013, before the IG allegedly "resolved" his issues. Even assuming that plaintiff could have exhausted his administrative remedies by writing to the IG,[10] he filed his federal action before the IG "resolved" the issue. The Second Circuit has held that administrative remedies must be

---

[10] The court also notes that on May 31, 2011, L. Peary, the IGP Supervisor at Bare Hill wrote a memorandum to Captain Harvey, stating that he had spoken to plaintiff that day about BRL-12122-11. (Dkt. No. 43-5 at 7). The memorandum states that plaintiff was complaining that "the grievances he has sent to the Inspector General's Office were not being filed." (*Id.*) Supervisor Peary states that he advised plaintiff that "there was no provision in Directive # 4040 for grievances to be submitted to the IG's Office, and if he wants to file a grievance, he must submit it directly to the IGP Office so that it may be processed per the established guidelines in Directive # 4040." (*Id.*) He also told plaintiff that while "complaints" submitted to the IG could be investigated, they were not "'grievances.'" (*Id.*) Supervisor Peary stated that although plaintiff was complaining about retaliation for "grievances" that he filed, he had only filed two grievances in 2011, and perhaps he was referring to "complaints" that he submitted directly to the IG, "not grievances." (*Id.*) Although letters to the IG would also be considered protected conduct, there is no indication that any defendant was aware of other letters, not mentioned by plaintiff in this complaint that were sent directly to the IG. It is also clear that plaintiff was specifically advised that writing to the IG was not considered filing a "grievance" as required by the regulations and the PLRA.

exhausted "prior to" filing the federal complaint. *Neal v. Goord, supra.* Thus, plaintiff failed to exhaust his administrative remedies with respect to any claim that defendant Miller assaulted him in retaliation for filing grievances. The same is true for any claim that plaintiff was issued a false misbehavior report in retaliation for his grievances and then bribed with dismissal of the charges if he would stop filing grievances.

There is no indication that defendant Miller's actions prevented plaintiff from filing a grievance regarding his alleged conduct. As stated above, plaintiff was transferred out of Bare Hill three days after the incidents of which he complains, and thus, defendant Miller could not have stopped plaintiff from filing any grievances after he was transferred to Clinton. Plaintiff claims that he tried to file grievances after he was released from observation, but there is no evidence that he did so. (Pl.'s Dep. at 61). Thus, defendant may not be estopped from asserting exhaustion.

Finally, this court can find no other special circumstances that would justify this plaintiff's failure to exhaust, and the complaint may be dismissed. However, even if plaintiff had exhausted his administrative remedies with respect to his claims against defendant Miller, this court would still recommend dismissal.

## IV.   <u>Retaliation</u>

### A.   <u>Legal Standards</u>

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir.

2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *see also Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.* Participation in the grievance process by an inmate is clearly protected conduct in the context of a retaliation claim. *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 367 & n. 21 (S.D.N.Y. 2011) (collecting cases).

To establish retaliation, the plaintiff must also demonstrate a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004). Although a "'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, . . . without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie*, 791 F. Supp. 2d at 370 (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id*. at 371. "Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt.*

13

*Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett*, 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.'" *Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.11 (N.D.N.Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint "must, among other things, be based 'on personal knowledge.'" *Id.,* 2006 WL 1133247, at *3 & n.7 (collecting cases); Fed. R. Civ. P. 56(c)(4).

A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights may be implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly*, 854 F.2d 584,

14

588-90 (2d Cir. 1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

## B. Application

After a careful review of the complaint and the defendant's exhibits, it is clear that plaintiff may be confused about the dates of some of the incidents alleged and what actually happened on those dates. The defendant's exhibits and declarations clarify what was happening during the time in question and the incidents leading up to the causes of action listed herein.

Plaintiff alleges that defendant Miller beat him in retaliation for filing grievances. Filing grievances is a constitutionally protected activity, and thus, plaintiff meets the first factor in the retaliation analysis. While it is true that beating an inmate in retaliation for filing grievances would rise to the level of a constitutional violation, as would any use of force that was excessive under the circumstances,[11] defendants have submitted a declaration, together with exhibits, from Sergeant John Berkman which shows that plaintiff's conclusory allegation of excessive force in retaliation for filing grievances is unsubstantiated by any evidence.

Sergeant Berkman, who is not a defendant in this action, states that on June 6,

---

[11] Inmates are protected against the use of excessive force by the Eighth Amendment, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000). Thus, excessive force would be a separate constitutional violation, whether the force was used in retaliation for a constitutionally protected activity or not.

2011, he went to plaintiff's SHU[12] cell to escort plaintiff to a doctor's appointment. (Berkman Decl. ¶ 2). When he arrived at plaintiff's cell, Sergeant Berkman "observed the plaintiff punching himself in the leg and thereafter causing further self-inflict[ed] injuries." (*Id.* ¶ 3 & Ex. 1). Sergeant Berkman wrote a memorandum to Captain Harvey on the same day, explaining the situation. (*Id.*) In this memorandum, Sergeant Berkman states that when he arrived at plaintiff's cell, he was punching himself violently in the right leg and stating "'stop what they been beating me not me.'"[13] When Sergeant Berkman asked plaintiff who he was referring to, plaintiff stated the "'people who just went through the wall of my cell.'" Plaintiff was then escorted to the SHU interview room, where he began to cry and told Sergeant Berkman that plaintiff "was going to be in a bag soon," that he "felt helpless and wanted to die," and that he had "been hurting himself on purpose because he deserved it." (*Id.*) Sergeant Berkman and another officer then escorted plaintiff to the medical department for an evaluation, and Berkman completed an Office of Mental Health ("OMH") referral form. The nurse informed Sergeant Berkman that plaintiff had been on the call-out for the medical department because he had been refusing all his medication and not eating. (*Id.*)

Sergeant Berkman states that, while they were waiting for the doctor, he observed plaintiff pinch himself and hit himself in the leg several times. Plaintiff was

---

[12] This statement is entirely consistent with defendant Miller's declaration, stating that plaintiff was escorted to SHU on June 3, 2011 after he was issued the misbehavior report for failing to obey a direct order.

[13] Although clearly related to an allegation that someone is beating plaintiff, this sentence makes very little sense. The court has quoted it exactly as in Sergeant Berkman's memorandum.

examined by both a doctor and a nurse, and he reiterated what he told Berkman, but then claimed that he "was beat up by 'COS.'"[14] (*Id.*) Sergeant Berkman asked Nurse Lashomb to write an inmate injury report, and Sergeant Berkman took photographs of plaintiff. Both Nurse Lashomb and Dr. Wiseman noted an abrasion on plaintiff's right side and dry skin behind his knee, injuries that were "[a]ll consistent with being self inflicted." Plaintiff was placed on a one-to-one OMH watch and was transferred to the Clinton Satellite Unit later the same day. (*Id.*) Plaintiff's transfer history shows that he was transferred to Clinton on June 6, 2011. (Berkman Decl. Ex. 2). He was held at Clinton until June 20, 2011, when he was transferred to Franklin Correctional Facility. (*Id.*) Defendant Miller was not involved in this incident at all.

Defendant Miller was involved with plaintiff three days before the June 6, 2011 incident. On June 3, 2011, defendant Miller issued plaintiff a misbehavior report. (Miller Decl. Ex. 3). Sergeant Kalin had ordered plaintiff to pack his belongings and move to a different unit because of a verbal altercation with another inmate. When plaintiff refused, defendant Miller was notified, and came to interview[15] plaintiff regarding the move. At the conclusion of the interview, defendant Miller ordered plaintiff to pack his belongings, and plaintiff refused again. Defendant Miller issued another order, and this time, plaintiff complied. He was then escorted to SHU without

---

[14] "COS" refers to Corrections Officers.

[15] Plaintiff alleges in the complaint that the "beating" by Miller took place after an "interview" regarding plaintiff's grievances. However, the "interview" on June 3, 2011 was held to determine why plaintiff was refusing to pack his belongings.

further incident, pending any subsequent disciplinary hearing.[16] (*Id.* & Miller Decl. ¶ 30). This was the usual procedure, and done at the behest of the Watch Commander. (*Id.*)

It is true, as plaintiff states, that he never had a disciplinary hearing regarding this misbehavior report, but not because defendant Miller bribed plaintiff with dismissal of the charges if he would stop filing grievances. Defendant Miller states that staff who issue misbehavior reports do not make the determination of whether disciplinary charges are pursued further. (Miller Decl. ¶ 31). Defendant Miller states that he has been advised that the disciplinary charges were not pursued for plaintiff's "admitted" misconduct on June 3, 2011. (*Id.* ¶ 33). Plaintiff admitted at his deposition that he refused the direct order to pack his belongings and move. (Pl.'s Dep. at 35). Plaintiff states that, instead of complying with the order, he demanded to speak with a Lieutenant. (*Id.*) Plaintiff's admission that he committed the misbehavior with which he was charged is fatal to his "retaliation" claim. *See Scott v. Coughlin*, 344 F.3d at 287-88 (summary judgment may be granted if the alleged retaliatory action would have occurred even without the improper motivation).

As stated above, plaintiff was transferred to Clinton for mental observation three days after the incident, and in his declaration, Sergeant Berkman states that in light of plaintiff's transfer to OMH at Clinton, it is likely that the charges, instituted by defendant Miller, were not pursued because the Administration considered it would not

---

[16] Plaintiff claims he was taken to SHU after he was released from the medical unit after the "assault" by defendant Miller. However, plaintiff was already in SHU when he was escorted to the medical unit by Sergeant Berkman three days later on June 6th, in part, because he was hurting himself.

18

be in plaintiff's best interests in light of his mental health status. (Berkman Decl. ¶ 8).

Plaintiff appears to have confused the two dates and the individuals who were involved with him during the two distinct incidents. The misbehavior report was issued by defendant Miller on June 3, 2011, after plaintiff admits refusing a direct order to move.[17] He was taken to SHU "without incident," pending a disciplinary hearing.

---

[17] As background information, it appears that plaintiff had a history of having issues with other inmates and having to be moved to different housing units. The information submitted by defendants in connection with plaintiff's grievances clarifies the plaintiff's situation. Plaintiff's January 10, 2011 grievance was filed against Sergeant Manor, who plaintiff alleged transferred him to another housing unit in retaliation for filing grievances. (Miller Decl. Ex. 1 at 9, 11). In a memorandum from Lt. Boyd to Captain Harvey, it states that Sergeant Manor denied harassing plaintiff and was not involved in moving him to D-2, although Sergeant Manor did interview plaintiff during the investigation of a previous grievance. (*Id*. at 13). The memorandum states that defendant Miller authorized the move based upon information from several inmates that plaintiff was involved in conduct "such as manipulating the inmate phone system as well as the T.V. schedules." (*Id*.) The memorandum states that defendant Miller's justification for moving plaintiff was "reasonable." (Id.)

On December 31, 2010, Sergeant Manor wrote a memorandum regarding plaintiff's allegation that he heard Officer Fowler telling someone on the telephone that Officer Fowler had a porter on A-2 (plaintiff was a porter on A-2) who needed to be moved and mentioned plaintiff's inmate number. (*Id*. at 17). Sergeant Manor interviewed plaintiff's own witness, who stated that he never heard Sergeant Fowler mention plaintiff while using the telephone on December 27, 2010. Officer Fowler also denied plaintiff's allegations. (*Id*.) Plaintiff's witness further stated that plaintiff was making these accusations in an effort to get transferred to another facility because his mother was ill. (*Id*.)

On January 19, 2011, defendant Miller wrote a memorandum to Lt. Flint, stating that defendant Miller received an anonymous note, claiming that plaintiff was "making threats toward other Inmates on the dorm . . . ." (*Id*. at 19). Defendant Miller states that he interviewed several inmates on the A-2 unit, and made a determination that plaintiff should be moved for the safety and security of the unit. Defendant Miller also completed an "Inmate program suspension form," which suspended plaintiff from his porter duties on the A unit. (*Id*.) The program suspension form indicates that plaintiff and another inmate were threatening each other, and that "[b]oth inmates were moved." (*Id*.) The fact that both inmates were moved is further support for the reasonableness of defendant Miller's actions in transferring plaintiff to a different housing unit.

Plaintiff's May 31, 2011 grievance resulted in an investigation into another housing unit move for plaintiff. The Superintendent responded on June 6, 2011, that plaintiff was interviewed on June 2, 2011 by a "Security Supervisor" concerning this grievance. (*Id*. at 5). The supervisor who interviewed plaintiff on June 2, 2011 was Lieutenant Gonyea. (*Id*. at 11). Lt. Gonyea's report states that he interviewed Sergeant Bedore on June 2, 2011, who stated that he had received confidential information that plaintiff had been labeled a "rat" by other inmates, and the move to a different housing unit was made for the plaintiff's protection. (*Id*.) Lt. Gonyea's interview with the plaintiff revealed that plaintiff

There was no beating and no trip to the medical unit on June 3, 2011. However, on June 6, 2011, plaintiff was taken to the medical unit for a scheduled appointment, after Sergeant Berkman saw him attempting to hurt himself. He did suffer minor injuries, but they were self-inflicted. Plaintiff was transferred to Clinton for observation on the same day, and the misbehavior report that defendant Miller issued on June 3, 2011 was not pursued due to plaintiff mental status. Plaintiff's allegations are completely inconsistent with the documentary evidence submitted by defendants.

Plaintiff has not responded in opposition to defendant's motion, and it is clear that all the documents submitted by defendant support his assertion that plaintiff did not exhaust his administrative remedies, and even if his remedies had been exhausted there is absolutely no evidence of retaliation in this case. Plaintiff's injuries, to the extent that he had any, were self-inflicted, plaintiff's movement within Bare Hill was clearly due to his own problems with other inmates, and his transfer to a "MAX" facility was because he was transferred to Clinton so that he could be observed by OMH, and had nothing to do with his grievances because he was transferred to Franklin[18] only two weeks after he transfer to Clinton. This is a case that is 'so replete with inconsistencies

---

believed that the move was due to a grievance that Lt. Munson investigated on May 27, 2011. (*Id.*) It is likely that the June 2, 2011 information from Sergeant Bedore was the precipitating factor for the June 3, 2011 move, which plaintiff initially refused, causing the June 3, 2011 misbehavior report. Plaintiff does not specify the intra-prison transfers as a basis for retaliation in this federal complaint, although he did so in his grievances. To the extent that the complaint may be inferred as raising such a claim, the evidence shows that it is meritless, and that, to the extent he was responsible, defendant Miller properly transferred plaintiff within the facility.

[18] Franklin Correctional Facility is a medium security facility. *See* www.doccs.ny.gov/faclist. html.

and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.'" *See Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, *supra*. Thus, even assuming plaintiff had exhausted his administrative remedies or the court found "special circumstances" which would have justified his failure to exhaust, plaintiff's claims would still be subject to dismissal on the merits.

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 43) be **GRANTED**, and that plaintiff's complaint be **DISMISSED** in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: December 19, 2014

Hon. Andrew T. Baxter
U.S. Magistrate Judge